SHUFFIELD *v.* HARTON.

5-2550                                    352 S. W. 2d 574

Opinion delivered January 8, 1962.

*Warren & Bullion,* for appellant.

*Clark & Clark* and *Barber, Barber, Henry, Thurman & McCaskill,* for appellee.

Jim Johnson, Associate Justice. This case involves interpretation of the provisions of a farm lease.

On September 20, 1952, appellants, Dr. Joe Shuffield and Ralph R. Harrell, entered into a written lease with B. M. Harton, now deceased, whereby appellants rented from Harton certain lands in Faulkner County, Arkansas, for a period of five years. The lease covered the years 1953, 1954, 1955, 1956 and 1957.

The lands were primarily leased by appellants for the purpose of cultivating rice, these lands being contiguous to Cadron Creek which was then a natural source of water for use in cultivating the rice. At the time of the lease the parties did not measure the land, but the description in the lease calls for 770 acres more or less. The lease[1] was prepared by Harton's attorney. It pro-

---

[1] "Farm Lease, Know all men by these presents: That this contract of lease, made and entered into this 20 day of September, 1952, by and between B. M. Harton, party of the first part, and Joe F. Shuffield and Ralph R. Harrell, parties of the second part, witnesseth:

"That the party of the first part has this day leased to the parties of the second part, for the years Nineteen Hundred and Fifty-three (1953), Nineteen Hundred and Fifty-four (1954), Nineteen Hundred and Fifty-Five (1955), Nineteen Hundred and Fifty-six (1956), and Ninetºen Hundred and Fifty-seven (1957), the following described lands lying in the County of Faulkner, State of Arkansas, to-wit:

"All that of Section Sixteen (16); and all that part of the North Half (N½) of the North Half (N½) of Section Twenty-one (21); and all that part of Section eight (8), lying East of Cadron Creek. And all of that part of S½ SW¼ of Section nine (9), lying South of Cadron Creek.

"All of the above described lands being in Township six (6) north, Range fourteen (14) West, and containing in the whole 770 acres, more or less.

"The parties of the second part agree to pay to the party of the first part, as rent for said lands for the years 1953, 1954, 1955, 1956, and 1957, the sum of Eight Thousand Dollars ($8,000) per year for all the cleared lands, and the further sum of Two Thousand Dollars ($2,000) per year for all the woods lands, said annual rentals to be due and payable as soon as the crops thereon are harvested, and not later than November 1st of the year in which said rents fall due.

"The parties of the second part agree to execute a note for $8,000.00 for each year covered by this lease for the cleared land, and also agree to execute a note for $2,000.00 for each year covered by this lease for the woods land, said notes to be due and payable on or before the 1st day of November of the year in which the rent represented by said notes accrues, said notes to bear 8% interest from maturity until paid.

"Now it is agreed by and between the party of the first part and the parties of the second part that in any year in which the parties of the second part clear fifty (50) acres or more of the woods land covered by this lease, the party of the first part will cancel the note of $2000.00 given by the parties of the second part for the rent on the

vided for the payment of $8,000 per year rental for the "cleared lands", and the sum of $2,000 per year rental for the "woods land". The lease treats the "cleared land" and the "woods land" as separate parcels. Five notes were executed for the annual rental payment of $8,000 per year for the cleared land, and five separate notes were executed for the payment of $2,000 per year for the rent on the woods land.

As an incentive to the clearing of the "woods land" by the appellants, the lease provided that if the lessees

---

woods lands for that year. It is further agreed that the parties of the second part may clear and put in cultivation as much of the woods lands as they wish in any year covered by this lease, but credit for such improvement shall be limited and applied to the $2000.00 notes given for rent on the woods lands only, and if the parties of the second part do clear more than fifty acres of the woods land in any one year, they may count the excess over fifty acres cleared that year on the fifty acres required for cancellation of the rent note on the woods land due the next year.

"The parties of the second part agree to keep all of the above described lands which are cleared and tillable at this time, and all such additional lands as they may clear and put in cultivation hereafter in good condition and in annual cultivation during the period covered by the lease.

"Now it is further agreed that if during the term of this lease the government should restrict the acreage allowed to be planted in rice the parties of the second part shall pay to the party of the first part, as annual rent on the cleared lands the following, to-wit: $20.00 per acre for all land planted in rice; and $15.00 per acre for all land planted in other crops, or available for other crops, for each year that said rice acreage may be restricted.

"It is further agreed that the parties of the second, their heirs or assigns, shall have the right, and are hereby given the right, to purchase the above described lands from the party of the first part at any time during the term of this lease at the same price offered by any other person, firm or corporation, provided the party of the first part desires to sell said lands at the price so offered.

"In the case of failure of the parties of the second part to pay any annual rental due under this lease when the same falls due, then the party of the first part, at his sole option, and by written notice to the parties of the second part, declare all rent notes and rental for the balance of this lease due and payable at once.

"I, Mildred J. Harton, wife of the said B. M. Harton, do hereby join in the execution of this contract of lease, and agree to join and cooperate in the execution of all conveyances which may become necessary in carrying it out.

"Executed in duplicate copies at Conway, Faulkner County, Arkansas, the day and year first above written.

/s/ B. M. Harton
Party of the First Part
/s/ Mildred J. Harton
/s/ Joe F. Shuffield
Party of Second Part
/s/ R. R. Harrell
Party of Second Part"

cleared 50 acres of the woods land in any one year, the $2,000 note given as rental for the woods land would be cancelled in that year. The lease further provided that in the event more than 50 acres of land was cleared in any one year, the excess acres over 50 could be carried forward to the cancellation of the $2,000 notes for subsequent years. In other words, the acreage of woods land cleared for credit on the $2,000 note was cumulative and could be carried forward by the lessees for credit. This point is not in dispute in the case.

Since the land had apparently been rented primarily as rice land, a paragraph was placed in the lease as follows:

7. ''Now it is further agreed that if during the term of this lease the government should restrict the acreage allowed to be planted in rice the parties of the second part shall pay to the party of the first part, as annual rent on the cleared lands the following, to-wit: $20.00 per acre for all land planted in rice; and $15.00 per acre for all land planted in other crops, or available for other crops, for each year that said rice acreage may be restricted.''

Pursuant to § 28-355, Ark. Stats., there was propounded to appellant Ralph R. Harrell certain interrogatories. Two of the questions and appellant's answers are as follows:

''3. State how many acres of woods lands have been cleared by Lessees under that contract since the date of the contract.

''A. Approximately 205 Acres.

''4. Give the number of acres cleared each year for the years 1953, 1954, 1955 and 1956.

''A. About 40 acres in 1952, but under this lease and for 1953 crop.

''About 150 Acres in 1953.

''About 15 acres in 1954  .  .  .''

Appellee doesn't contest the correctness of appellant Harrell's conclusion as to the number of acres of woods lands cleared during the term of the lease.

Appellants paid the rental in 1953 and 1954 by paying the $8,000 notes for cleared land and by taking a credit on the payment of $2,000 notes for the woods land cleared by them. In 1955 the amount of rice which could be grown was restricted by the Government so that paragraph 7 of the contract came into effect and this brought about the dispute which has culminated in this appeal. The Government restriction also continued for 1956 and 1957. The owner claimed that, under the terms of the contract, when the cultivation of rice was restricted, the appellants became liable to him for acreage rental not only on the "cleared land", but also lost their credit for "woods land" cleared, and became liable as well for acreage rent on all "woods land" which was cleared by them, said acreage rental to be on the basis of $20 per acre for all lands planted in rice and $15 an acre for all other lands subject to cultivation. The owner claimed that in addition to the acreage rental for all land available for cultivation in 1955, 1956, and 1957, the lessees owed the $2,000 notes for rental on woods lands which remained uncleared. The appellants' contention was that they were liable only for an acreage rent on the "cleared lands" and that having cleared a sufficient amount of woods lands to completely satisfy four of the $2,000 notes and to partially satisfy the fifth $2,000 note, they were entitled to plant the cleared woods lands free of any acreage rental charge, except the balance owing on the last $2,000 note.

The parties also were unable to agree on the amount of land available for cultivation in the "cleared land".

The lease contained a clause which provided that the lessees agreed to keep all of the lands, both the cleared lands and additional lands they might clear and put in cultivation, in good condition during the period covered by the lease. Appellee contended that the lessees had not kept the property in good condition but had

allowed same to grow up in coffee beans and that there was a breach of this part of the contract and damages were sought therefor.

The trial court interpreted the contract as contended by the owner (who died during the pendency of the case and who was succeeded as plaintiff by his administratrix), and also found for the owner with reference to the amount of land available for cultivation and the damage to the land. The appellants thereupon prosecuted this appeal.

After a careful review of the record on trial *de novo,* we cannot say that the Chancellor's findings in the following eight particulars are against the weight of the evidence.

1. That the land which was cleared and tillable on the date of the lease consisted of 328 acres.

2. That appellants cleared 205 acres of the ''woods land'' which according to the terms of the lease cleared or paid four of the $2,000 notes with 5 acres to apply as a credit of $200 on the fifth $2,000 note, leaving a balance of $1,800 due on that note.

3. That the lease provided the lessees should keep the land in good condition and in annual cultivation and that they breached this provision of the lease and that appellee is entitled to damages in the sum of $1,000.

4. That appellants paid on the rent due for the year 1955, $4,803.75, which was without prejudice to either side.

5. That no rice was planted on the original 328 acres of cleared land in the year 1955.

6. That no rice was planted on the original 328 acres of cleared land in the year 1956.

7. That 89 acres of rice were planted on the original 328 acres of cleared land in the year 1957.

8. That interest at the rate of 6 per cent per annum should be paid on the unpaid amount found due for the

year 1955 to run from November 1, 1955, and from November 1, 1956, on the amount found due for that year; and from November 1, 1957, on the amount found due for that year.

We cannot agree, however, with the Chancellor's interpretation of the meaning of the words "cleared lands" as contained in the lease. The question presented for our consideration is whether the words "cleared lands" used in the lease refer to lands cleared at the time of the execution of the lease, or do they refer to land then cleared and to be cleared in the future?

As we view this matter, paragraph 7 of the lease, which is set out above, was obviously inserted in the lease for the protection of the lessees in the event all the land could not be placed in the cultivation of rice. It provides that should the Government restrict the acreage allowed to be planted in rice, the parties of the second part (appellants) shall pay to the party of the first part (appellee) as annual rent on the cleared land the sum of $20 per acre for all land planted in rice, and $15 per acre for all land planted in other crops. The term "the cleared lands" used here is exactly the term used in paragraph 3 to identify the lands on which the $8,000 rental would be paid, and is the same term used in paragraph 4 to describe the lands for which the $8,000 note was to be executed.

The woods land was dealt with separately. The parties agreed that the woods land would be leased for $2,000 per year and notes were executed for the rent of that particular part of the farm. The contract further provided that if the lessees cleared 50 acres of the woods land the note for the woods land for that particular year would be cancelled, and if they cleared 100 acres two notes would be cancelled, etc., so that if 250 acres were cleared in the five-year term all the notes for the woods land would be cancelled and there would remain only the rent payment for the land which was cleared when the farm was rented. The contract says "if the parties of the second part do clear more than 50 acres of the woods

land in any one year, they may count the excess over 50 acres cleared that year on the 50 acres required for cancellation of the rent note on the woods land due the next year.''

We have carefully noted that there was no mention made of the cancellation of the notes on the woods land in the event of government restrictions on rice. The contract merely provided for a new basis of rent on ''the cleared lands''. The lease, in our view, must be interpreted in the light of the facts and circumstances as they existed at the time of the lease. At the time of the lease the cleared lands were the lands which were then cleared. Had the lease used the words ''cleared or to be cleared'', the interpretation would be different.

We reach this conclusion by following the principle of law that Equity Abhors Forfeitures. *Cordell* v. *Enis,* 162 Ark. 41, 257 S. W. 375. To find contra would effectuate a forfeiture which in our view was clearly not in the contemplation of the parties. Further, it is uncontradicted that appellee, through his attorney, prepared the contract. This being true, even if the language of the contract was doubtful we would be bound to follow the well settled rule of construction that contracts so prepared are construed in the strongest manner against the party who prepared them. See: *Leslie* v. *Bell,* 73 Ark. 338, 84 S. W. 491; *Ford Hardwood Lumber Co.* v. *Clement,* 97 Ark. 522, 135 S. W. 343; *Taylor* v. *Union Sawmill Co.,* 105 Ark. 518, 152 S. W. 150; *American Insurance Co.* v. *Rowland,* 117 Ark. 875, 8 S. W. 2d 452; *Gen. American Life Ins. Co.* v. *Schwarz,* 193 Ark. 663, 101 S. W. 2d 963; *Meers* v. *Tommy's Men's Store, Inc.,* 230 Ark. 49, 320 S. W. 2d 770; *Arkansas Power & Light Co.* v. *Murry,* 231 Ark. 559, 331 S. W. 2d 98.

It follows, therefore, that since the case has been fully developed we find that the appellee is entitled to receive as rent for the year 1955, $15 per acre for 328 acres, such amount to be credited with the $4,803.75 previously paid by appellant on such indebtedness, the bal-

ance for that year to bear interest at the rate of 6 per cent per annum from November 1, 1955.

For the year 1956, $15 per acre for 328 acres with interest at the rate of 6 per cent per annum from November 1, 1956.

For the year 1957, $20 per acre for 89 acres which were planted in rice, and $15 per acre for 238 acres, with interest at the rate of 6 per cent per annum from November 1, 1957, plus the $1,800 balance owing as rent on the woods land note, with interest as provided in the note.

In addition to the rent as set out above, appellee is to receive the $1,000 damage as found by the Chancellor, which of course bears interest at 6 per cent from the date of the Chancellor's decree.

Therefore, the Chancellor's decree is reversed and the cause remanded with directions to enter a decree and have further proceedings in accordance with this opinion. Costs of this appeal are taxed equally.